# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO: 10-219 |
| | : | |
| RAPHEAL F. MCNAMARA-HARVEY | : | |

## GOVERNMENT'S SENTENCING MEMORANDUM

Defendant Rapheal F. McNamara-Harvey plead guilty to Count two of the indictment charging him with violating Title 26, United States Code, Sections 5845(a), 5861(d), and 5871 (possession of an unregistered destructive device).  He is scheduled to be sentenced on January 13, 2011.  The government has agreed to dismiss count one at the time of sentencing.

McNamara-Harvey has an offense level of 23 and a Criminal History Category of VI.  McNamara-Harvey's guideline range is 92-115 months imprisonment.  The government requests that the Court impose a sentence within this sentencing guidelines range.

## I.    BACKGROUND

On October 6, 2010, the defendant pled guilty and accepted responsibility for his role in the offense outlined above.  During his plea colloquy, the defendant admitted that he possessed a destructive device and that the device was not registered, nor was he registered to possess such a device.

## II.   FACTS

On Wednesday, December 30, 2009, at approximately 11:00 a.m., security personnel for pharmaceutical and consumer health care corporation GlaxoSmithKline (GSK) encountered an individual who appeared to be a homeless male trespassing and residing at a corporate owned garage located at 401 North 16th Street in Philadelphia, Pennsylvania.  GSK

and the garage were closed at the time due to the holiday.

Upon being confronted by GSK security, the male provided GSK security with his Pennsylvania identification card.  The card identified the male as Rapheal F. MCNAMARA-HARVEY (hereinafter MCNAMARA), date of birth August 24, 1982, and an address of 1437 Gwynedale Way, Lansdale, Pennsylvania, 19446.  GSK personnel immediately notified the Philadelphia Police Department, however the male escaped prior to the arrival of the police.  Although the male did retrieve one of his bags prior to fleeing, he left behind several other bags containing personal possessions including clothes, personal care items, literature, and an HP laptop computer.

During a search of the area where the male was located, which was close proximity to an exterior back-up generator for the garage, police found what was believed to be an improvised incendiary device, comprised of a 12 ounce glass beer bottle with a grey/black material on the top and a shoe-string type wick, along with the odor of gasoline (hereinafter "Device").  The ATF's City-Wide Arson Task Force responded along with members of the JTTF. The device was rendered safe and seized by the task force and submitted to the ATF laboratory for analysis.  ATF laboratory tests revealed that the Device contained gasoline and had polystyrene in it.  The ATF laboratory personnel indicated that the polystyrene/gasoline mixture is commonly known as improvised napalm.  The Device was determined to be a destructive device as defined in Title 26, United States Code, Section 5845(f).

GSK security personnel provided to ATF a copy of GSK video surveillance of the GSK garage which shows MCNAMARA carrying a 12 ounce beer bottle, consistent with the type the improvised incendiary device was made of.  In addition, certain frames of the video also

depict MCNAMARA carrying what appears to be the completed device.

Police learned that MCNAMARA was the subject of a tip from a concerned citizen.  On December 12, 2009, the concerned citizen reported to the FBI that Raphael al-Sammouni MCNAMARA was posting increasingly radical pro-Palestinian/Anti-Israeli messages and videos on his Facebook page.  The concerned citizen indicated that MCNAMARA claimed that he wanted to hold protests in Philadelphia and start a riot.  The tipster also stated that MCNAMARA posted that he quit his job for "the cause."  FBI agents also learned that MCNAMARA expressed a desire to obtain a passport so he can travel to Yemen and/or Palestine to study Islam.

On December 23, 2009, prior to the incident at GSK, FBI agents interviewed MCNAMARA.  During this interview, MCNAMARA stated that he is not Muslim or an adherent of Islam.  MCNAMARA acknowledged that he uses Facebook and posts content on his Facebook page which some people would find disturbing and/or extremist in nature. MCNAMARA also claimed that his postings were not meant to incite violence, but provoke thought and dialogue.  On January 11, 2010 MCNAMARA was arrested by Philadelphia Police on a burglary warrant stemming from the December 30, 2009 incident at GSK.

After December 30, 2009 agents/officers involved in this investigation have accessed MCNAMARA's Facebook page and viewed a publicly available information.  Upon reviewing the information contained on this page, agents observed that MCNAMARA had approximately 169 photographs posted on his site of which only 99 are publically viewable to the agents/officers.  The photographs generally are of an anti-Israeli, anti-Zionist nature, with pro-Palestine sympathies.  However, some photographs equate the Israeli government, military

3

and citizens with Nazis, war criminals, and terrorists.  Some photographs are pro-Hamas (a United States-designated terrorist group) in nature, with one photograph bearing the caption "Every time a martyr falls, Hamas is strengthened."  At least four images appear to justify violence in the Israeli-Palestinian conflict, and one displays a handgun with ammunition, other photographs show what appear to be Palestinian youths throwing rocks and stones.

During the course of this investigation, law enforcement officials obtained and executed five search warrants.  Those warrants were executed on the following: (1) McNamara's laptop computer; (2) McNamara's Facebook account; (3) McNamara's Myspace account; (4) a University of Pennsylvania locker belonging to McNamara's female friend; and (5) the contents of the electronic items retrieved from inside of the University of Pennsylvania locker.  In his motion, the defendant only challenges the search of his laptop computer, therefore this response will only address that search warrant.

On January 13, 2010, a Federal Search Warrant was issued for Raphael MCNAMARA's laptop computer, a Hewlett Packard (HP) Pavilion Entertainment PC (Special Edition) laptop computer, model Pavilion dv4-1275mx, s/n CND91130CZ that was recovered on December 30, 2009, from the GlaxoSmithKline (GSK) parking garage.  That laptop was subsequently sent to the Philadelphia Regional Computer Forensics Laboratory (RCFL) to be searched.  Among the documents that were found on the laptop were:

1.      The Anarchist Cookbook (last accessed on 11/27/09),

2.      The Jolly Roger Cookbook (last accessed on 12/29/09),

3.      End Evil (last accessed on 12/26/09),

4.      DarkStorm's Book of Compiled Articles on Destruction, Crime and Other Illegal

4

Acts (last accessed on 12/26/09),

5.      NEFA Foundation Report - "The Fort Dix Plot, Report #13 in a NEFA Series, 'Target America', a NEFA Analysis of <u>US v. Shnewer</u>, January 2008" (last accessed on 12/17/09),

6.      The Covenant of the Islamic Resistance Movement (Hamas), 18 August 1988 (last accessed on 11/27/09),

DarkStorm's Book of Compiled Articles on Destruction, Crime and Other Illegal

Acts describes on page 104, how to make a Molotov Cocktail as follows:

To finish off I will throw in the infamous Molotov-Cocktail [sic]. Moltov-Cocktail:

Whiskey bottle, cap, tampon, copper wire, gasoline. Drink the whiskey first.

Ok, now you can begin, Fill the bottle with gasoline, and screw on its cap.  Next dip the tampon, yes, a tampon (or a cotton ball for those of you who are wimps) in gasoline.  Wrap  the copper wire around the neck of the whiskey bottle, securing the tampon in place.  Light the tampon and throw.

If the cap is on well, then you can hold it for as long as necessary, the cocktail will not explode until the glass shatters.

The DarkStorm book goes on to include a Moltov Cocktail variation (still on page 104):

Variation of Moltov-Cocktail:

Same as above, but fill the bottle with Styrofoam after drinking the whiskey. Then fill with gasoline and proceed as planned.

The Styrofoam will melt when the bottle explodes, and will remain molten for a few seconds before hardening again.  This is extremely painful if it gets on you, and will usually cause third degree burns.

Can be used to take out wooden buildings or other substances which require a long heating before combustion.  The Styrofoam will burn for a while hot enough to ignite most wood structures.

Have a hell of a time, and remember, there's nothing wrong with what you are doing, til you get caught.

The document entitled "End Evil" appears to be a website that was saved to MCNAMARA's computer. It contains a list of companies that should be "Black Listed." Among the companies on the "Black List" is GlaxoSmithkline. The document alleges that one of GSK's drugs, Myodil, causes a disease called Adhesive Arachnoiditis. The document further alleges that GSK "must have known that Myodil was toxic when it was first released onto the market in 1946…" The document states that Myodil was discontinued in the UK, but it is still manufactured and sold overseas.

## III. SENTENCING CALCULATION

### A. Statutory Maximum Sentence.

### Count Two - Title 26, United States Code, Sections 5845(a), 5861(d), and 5871-

The maximum sentence is 10 years imprisonment, a $10,000 fine, a $100 special assessment, and a three-year period of supervised release on each count.

### Total Maximum Sentence -

The total maximum sentence is 10 years imprisonment, a $10,000 fine, a $100 special assessment, and a three-year period of supervised release.

### B. Sentencing Guidelines Calculation.

The Probation Office calculated the defendant's advisory guideline range to be 92-115 months imprisonment. The government agrees that this range was properly calculated.

6

IV.   **ANALYSIS.**

A thorough consideration of all of the sentencing factors set forth in 18 U.S.C. § 3553(a) suggests that this Court should consider the calculation of the advisory guidelines as set forth above, review all other factors, including the government's motion for upward departure, and impose a sentence above the stated sentencing guidelines range of 51-63 months imprisonment.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the

offense.  18 U.S.C. § 3553(a).[1]

**Consideration of the 3553(a) Factors.**

**(1)**     **The nature and circumstances of the offense and the history and characteristics of the defendant.**

The defendant engaged in serious criminal activity by possessing an unregistered destructive device.  At the time he possessed this device, a Molotov cocktail, the defendant was unlawfully on the premises of GlaxoSmithKline (GSK).  It appears from the evidence that while on the premises unlawfully the defendant researched on his computer how to construct the device.  The evidence also suggests that he constructed the device while unlawfully on GSK's premises.  In addition, a search of McNamara-Harvey's computer revealed that he also researched GSK, specifically a drug that was produced by GSK which, as the literature suggests, caused harm to people who used it.

All of this can suggests that McNamara-Harvey may have intended to deploy the device and cause destruction to GSK property.  Fortunately he was caught before he did so.

A review of the Presentence Report clearly demonstrates that McNamara-Harvey has engaged in high risk criminal behavior much of his life.  Beginning in 1997 when he was only 15 years old and continuing to his arrest on this case in January 2010, McNamara-Harvey

---

[1] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

has been arrested nine times.  These arrests have led to two adjudications for burglary and criminal attempt.  In addition, McNamara-Harvey was convicted conspiracy to commit theft from a motor vehicle, attempted theft from a motor vehicle, resisting arrest, receiving stolen property, and two counts aggravated assault on police and resisting arrest.  As a result of these convictions McNamara-Harvey has spent time in jail.  Also, following his release from prison he has violated the terms of his parole on several occasions.  There is no question that he has been a menace to society for several years and his criminal conduct has escalated with the passage of time.

**(2)**      **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

The offense of conviction is serious.  The evidence demonstrates that McNamara-Harvey constructed a destructive device and possibly intended to deploy it in an effort to destroy or damage property.  Clearly the sentence must address the seriousness of this conduct.  Also, his past behavior strongly suggests that McNamara-Harvey lacks respect for the law.  Thus the Court's sentence in this case must act as a reminder to McNamara-Harvey that he is required to develop respect for the law, and conform his conduct to the guidelines set forth in the law.

**(3)**      **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

There is no doubt that the Court's sentence in this case must deter others like McNamara-Harvey who would consider engaging in similar serious criminal conduct.  Thus the need for general deterrence is great.  Also, McNamara-Harvey himself must be deterred from committing future crimes.  He is a longtime criminal who has demonstrated time and time again that he is not capable of conforming his conduct to the norms of society and exist with the legal parameters established by Congress.  Based on his repeated involvement in the criminal justice

system, it appears very likely that McNamara-Harvey will return to criminal activity after he is released from prison.  Therefore it is necessary to impose a significant period of incarceration to insure that he is deterred from future criminal conduct and to protect society from McNamara-Harvey for at least the period of time that he is incarcerated.

**(4)** **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

McNamara-Harvey related to the probation officer that he has struggled with alcohol and drug addiction since the age of 12.  He has used alcohol frequently and marijuana on a daily basis.  He has also used acid, PCP, angel dust, Percocet, Vicoden and Xanax.  Although McNamara-Harvey reported that he stopped using drugs when he was twenty, it appears that he could still benefit from drug treatment/counseling while incarcerated as he has never successfully completed drug treatment.

Although McNamara-Harvey has obtained his GED while incarcerated on a previous case, he does not have any steady and significant employment history.  At best his employment history can be described as sporadic.  Also, it does not appear that McNamara-Harvey has developed any special skills.  He could benefit from vocational training while incarcerated.  The government requests that in addition to intensive drug treatment, McNamara-Harvey be made to participate in vocational training as part of his sentence to assist him in obtaining employment upon his eventual release from prison.

**(5)** **The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.**

McNamara-Harvey is the typical federal defendant.  He has a lengthy criminal history and a significant history of substance abuse.  The guidelines range calculated by the

10

probation department adequately takes into consideration all relevant information about the defendant and his crimes.  Therefore, a sentence within the sentencing guidelines range will avoid unwarranted sentence disparities.

**(6)      The need to provide restitution to any victims of the offense.**

      Restitution is not an issue in this case.

**V.      CONCLUSION**

      Therefore, in sum, all of the appropriate considerations of sentencing favor the imposition of an appropriate sentence within the sentencing guidelines range proposed by the government.

      Respectfully submitted,

      ZANE DAVID MEMEGER
United States Attorney


      s/Salvatore L. Astolfi
SALVATORE L. ASTOLFI
Assistant United States Attorney

11

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing

Memorandum has been served by the district court clerk's electronic filing system upon:


Defender Association of Philadelphia
Federal Court Division
The Curtis Center Building
601 Walnut Street
Suite 540 West
Independence Square West
Philadelphia, PA 19106

Attn: David M. Kozlow, Esquire



s/Salvatore L. Astolfi
SALVATORE L. ASTOLFI
Assistant United States Attorney


DATED:  January 6, 2011.